UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| SHERRY L. BOYNTON, | : | |
| | : | |
| *Plaintiff*, | : | |
| v. | : | No. 1:06-cv-30 |
| | : | *Lee* |
| SOUTHEASTERN TENNESSEE STATE | : | |
| REGIONAL CORRECTIONAL FACILITY, | : | |
| VIRGINIA LEWIS, GREG WILSON, and | : | |
| DOROTHY SHIRLENE BREWER, | : | |
| | : | |
| *Defendants*. | : | |

## MEMORANDUM AND ORDER

### I.    Introduction

Before the Court is the motion of Defendants, Southeastern Tennessee State Regional Correctional Facility ("STSRCF"), Virginia Lewis ("Lewis"), Greg Wilson ("Wilson") and Dorothy Shirlene Brewer ("Brewer"), for summary judgment pursuant to Fed. R. Civ. P. 56 [Doc. No. 37]. In support of their motion Defendants filed a supporting memorandum, statement of undisputed fact, and notice of filings [Doc. Nos. 38, 39 & 40]. Plaintiff Sherry L. Boynton has filed a response in opposition to Defendants' motion for summary judgment and a response to the statement of undisputed facts [Doc. Nos. 43 & 44]. Defendants have filed a reply to Plaintiff's response [Doc. No. 45]. Consequently, Defendants' motion is now ripe for review. For the reasons which follow, Defendants' motion for a summary judgment [Doc. No. 37] will be **GRANTED** and the Plaintiff's claims will be **DISMISSED WITH PREJUDICE**.

## II.     Procedural and Factual Background

### A.     Procedural History

Plaintiff filed her original complaint *pro se* naming only STSRCF as a Defendant [Doc. No. 3]. Subsequently, Plaintiff filed a *pro se* amended complaint as a matter of right pursuant to Fed. R. Civ. P. 15(a) [Doc. No. 6]. Plaintiff's *pro se* amended complaint added Lewis (the STSRCF Warden), Wilson (the Health Administrator who oversaw the medical program including the nurses), and Brewer (Plaintiff's immediate supervisor) as Defendants [*id.* & Doc. Nos. 39 & 44]. Defendants filed their answer to Plaintiff's *pro se* amended complaint on March 22, 2006 [Doc. No. 11]. On March 27, 2006, Defendants filed a motion to dismiss under Fed. R. Civ. P.12(b)(1) [Doc. No. 14].

Plaintiff retained counsel on May 4, 2006 [Doc. No. 20]. Plaintiff's motions for an extension of time to respond to Defendants' motion to dismiss and for leave to file a second amended complaint were granted [Doc. No. 21]. Thereafter, on June 5, 2006, Plaintiff filed her second amended complaint (the "amended complaint") [Doc. No. 23] and a response in opposition to Defendants' motion to dismiss [Doc. No. 24]. Defendants filed their answer to Plaintiff 's amended complaint on June 15, 2006 [Doc. No. 27].

On July 28, 2006, this Court granted in part and denied in part Defendants' motion to dismiss [Doc. No. 28]. Plaintiff's claims against STSRCF and Lewis, Wilson, and Brewer in their individual and official capacities for monetary damages under Title I of the Americans With Disabilities Act ("ADA") and Plaintiff's claims against STSRCF and Lewis, Wilson, and Brewer in their official capacities under 42 U.S.C. § 1983 were dismissed under Rule 12(b)(1) as barred by the Eleventh Amendment [*id.* at 11-12]. Plaintiff's claims against STSRCF for prospective injunctive relief under Title I of the ADA, Plaintiff's claims against Lewis, Wilson, and Brewer in their individual

capacities under 42 U.S.C. § 1983, and Plaintiff's state law claims for defamation and for "whistleblower" retaliation under Tenn. Code Ann. § 50-1-304 were not dismissed [*id.*]

On March 1, 2007, Defendants filed a motion to dismiss Plaintiff's state law claim that she was wrongfully terminated in retaliation for "whistleblowing" activity in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) [Doc. No. 29]. On April 10, 2007, the Court granted Defendants' motion and dismissed Plaintiff's claim of wrongful termination in retaliation for "whistleblowing" activity under Tenn. Code Ann. § 50-1-304 for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) as barred by the Eleventh Amendment [Doc. No. 32].

### B.    Facts

Plaintiff was hired as a registered nurse at STSRCF on or about March 1, 2005 [Doc. No. 23 at 2, ¶ 5]. Plaintiff was terminated on or about August 1, 2005 [Doc. No. 43-6 at 1, ¶ 6].

### 1.    July 2005 Events

The events at STSRCF the evening of July 30, 2005 and into the early morning hours of July 31, 2005 are at the heart of this case. On July 30, 2005, Plaintiff returned[1] to STSRCF at 2:00 p.m. to work the second shift [Doc. No. 40-9 at 8]. Plaintiff's duties included handling the nighttime "med pass" at STSRCF, which is the distribution of routine medications to inmates in housing Units 1, 2, and 7 and the Annex, and is generally conducted at about 8:00 p.m. [*id.* at 4-5]. The nurse

---

[1] Plaintiff also worked the second shift from 2 p.m. to 10 p.m. on the evening of July 29, 2005. Brewer gave Plaintiff permission to work past the end of her shift to help complete some "chain bus charts" [Doc. No. 40-4 at 17-19, 28; Doc. No. 40-9 at 8]. Chain bus charts are the medical charts of new inmates at STSRCF, and each chain bus chart has to be reviewed by a nurse [*id.*]. There were a number of chain bus charts to be reviewed and Plaintiff left STSRCF at approximately 7:30 a.m on July 30, 2005 after completing some of the chain bus charts [*id.*].

handling the "med pass" generally starts at the Annex at approximately 7:30 p.m. and has about an hour's leeway to distribute the medications [*id.* at 5-6]. Brewer could only remember two times when the 8:00 "med pass" had not been completed within one hour, one time was the instant situation and the other time was when an inmate died [*id.* at 5-6].

Defendants contend Plaintiff was terminated because she did not timely distribute medications to Units 1, 2, and 7 on the evening of July 30, 2005. During Plaintiff's deposition, which was taken on January 30, 2007, Plaintiff testified the "med pass" consists of distributing routine medications, which are taken at regular intervals, and "PRN"[2] medications, which are used to treat problems such as headaches as needed. During her deposition Plaintiff gave several explanations for her failure to timely distribute the medications but she did not dispute she failed to timely complete the "med pass" around 8:00 p.m.

Plaintiff acknowledged there was an 8:00 p.m. "med pass" at STSRCF [Doc. No. 40-4 at 36]. She stated the "med pass" is done at 8:00 p.m. if the medication is available [*id.*]. Plaintiff stated all of the medications for the "med pass" were not available on the evening of July 30, 2005 [*id.*]. Plaintiff stated it was her understanding the available "med pass" medications should be distributed at 8:00 p.m. and it generally takes 15 minutes per unit to handle the 8:00 p.m. "med pass" [*id.* at 38-40]. She described the events of July 30, 2005 as "just an isolated incident." [*id.* at 40].

Initially, Plaintiff testified that at about 7:00 p.m. on July 30, 2005, she was in the STSRCF clinic dealing with inmates who had various issues [Doc. No. 40-4 at 21]. She left the clinic at 8:30 or 9:00 p.m. to deliver supplies to the Annex, a housing unit for inmates that is separate from the main prison compound [*id.* at 23]. Plaintiff spent some time cleaning up calamine lotion she had

---

[2] *Pro re nata* (as needed/when necessary).

spilled in the Annex medical supply room and also handled the "med pass" for the Annex [*id.* at 24-26].  Plaintiff testified she remained at the Annex until approximately 10:00 p.m. [*id.* at 24].

Plaintiff returned to the clinic at approximately 10:00 p.m. for the "med pass" for Units 1, 2, and 7 [*id.* at 26].  Plaintiff testified she spent about 20 minutes preparing the medications for Units 1, 2, and 7 [*id.* at 27].  Plaintiff also telephoned Brewer and obtained permission to stay beyond the 10:00 p.m. end of her shift [*id.* at 28].  By that time, nurses had arrived for the third shift at STSRCF.  Plaintiff asked a third shift nurse, Cindy Woodlee ("Woodlee"), for help [*id.*].  Plaintiff testified Woodlee took the "med pass" medications to Unit 7 and she took the "med pass" medications to Unit 1 [*id.* at 29].

Plaintiff went to Unit 1, but on her way she found a live frog in the entrance to Unit 1 [*id.* at 30].  She told the officer on duty, Officer Phillips, she found the frog and was going to take it outside and wash her hands before distributing the "med pass" medications [*id.* at 30-31].  Plaintiff returned to the clinic, washed her hands, and then returned to Unit 1 at approximately 10:30 p.m [*id.* at 32].  She remained there and distributed the "med pass" medications [*id.*].

Plaintiff testified she then proceed to Unit 2, where she distributed the "med pass" medications for about ten minutes [*id.* at 32-33].  Plaintiff testified she returned to the clinic at 11:00 p.m. and remained there until 7:30 a.m. the next morning [*id.* at 34-35].

After being shown a letter Woodlee wrote to Brewer concerning the events of July 30, 2005, Plaintiff changed her deposition testimony concerning the events of that evening.  Woodlee's letter stated that personnel from Units 1 and 7 telephoned at approximately 10:30 p.m. because the inmates had not received their 8:00 p.m. "med pass" medications.  In her letter, Woodlee stated she asked if Plaintiff needed help, but Plaintiff disputed this in her testimony and stated she asked Woodlee

for help [Doc. No. 40-4 at 42]. Plaintiff then testified she had already prepared the "med pass" medications for Units 1, 2, and 7 before she left to go to the Annex [*id.* at 51, 56]. Plaintiff testified she distributed all the routine medications to Unit 7 after leaving the Annex at about 9:30 [*id.* at 56-57]. Plaintiff stated she remained at Unit 7 for about 15 to 20 minutes [*id.* at 57], and proceeded to Unit 2 at about 10:20 p.m [*id.* at 59]. Plaintiff testified she then went to Unit 1, where she found the frog [*id.* at 60]. After being at Unit 1 for about five minutes, Plaintiff returned to the clinic to wash her hands [*id.* at 60-61].

Plaintiff testified she asked Woodlee to handle the "med pass" for Unit 1 at about 10:35 p.m. [*id.* at 62]. Woodlee was going to Unit 1 to distribute both the "med pass" medications and the PRN medications as neither had been distributed at that time [*id.* at 64]. Plaintiff testified she returned to Unit 2 to dispense PRN medication to an inmate at approximately 10:40 p.m [*id.* at 62]. She stated that at approximately 11:00 p.m. she returned to the clinic to prepare PRN medication for Unit 7 [*id.* at 66]. She left the clinic at about 11:15 p.m. to deliver the PRN medication to Unit 7 [*id.* at 66-67]. Plaintiff stated she returned to the clinic at about 11:30 p.m., left to eat supper and returned to the clinic at about midnight, where she remained until 7:30 a.m. [*id.* at 67, 68].

Plaintiff was then shown a letter written by Lewis which sets forth a detailed account of the events that allegedly transpired at STSRCF on the evening of July 30, 2005. After reading the letter during her deposition, Plaintiff stated she agreed with Lewis' statement she left for the Annex at 7:40 p.m., not 8:30 p.m. or 9:00 p.m. as she had previously testified [Doc. No. 40-5 at 25-26]. Plaintiff also agreed with the assertion in Lewis' letter that she had not distributed the "med pass" medications to Units 1, 2, or 7 by the time she returned to the clinic at approximately 10:00 p.m [*id.* at 26].

Plaintiff was then shown a letter she had written to Commissioner Little of the Tennessee Department of Correction ("TDOC") [*id.* at 37]. In her letter to Commissioner Little, Plaintiff stated Woodlee had distributed the "med pass" medications to Units 1 and 2, while Plaintiff had distributed the "med pass" medications to Unit 7 [*id.* at 38-39].

Plaintiff was next shown the prison log books for the evening of July 30, 2005 [Doc. No. 40-6 at 7-25]. Based upon her review of one of the log books, Plaintiff stated she went to the Annex to distribute medications at about 7:40 p.m. and returned from the Annex at about 10:00 p.m. on July 30, 2005 [Doc. No. 40-6 at 12]. According to the log book for Unit 2, Plaintiff signed into Unit 2 to distribute medications at 9:33 p.m. and signed out at 9:40 p.m. Plaintiff denied writing the times in the log book, stating she had left the times blank for the officers to fill in [Doc. No. 40-6 at 15]. Although Plaintiff had testified she arrived at Unit 2 after 10:00 p.m. to distribute the "med pass" medications, the log book indicated Woodlee arrived at Unit 2 at 12:05 a.m. on July 31, 2005 to distribute the 8:00 p.m. "med pass" medications [*id.* at 17].

Plaintiff was then shown a copy of the log book from Unit 1, which indicated Plaintiff arrived at Unit 1 at 10:17 p.m. and left at 10:34 p.m. because she had forgotten the medications [*id.* at 19]. Plaintiff admitted arriving at Unit 1 at that time, but denied forgetting the medications [*id.*]. The log book further indicated at 11:25 p.m. an officer called the clinic because no one had delivered the "med pass" medications [*id.* at 19-20]. The log book noted Woodlee had arrived at Unit 1 at 12:35 a.m. on July 31, 2005, to distribute the "med pass" medication [*id.* at 20]. Plaintiff testified she had no reason to believe this entry in the log book was incorrect [*id.*].

Plaintiff was shown the log book for Unit 7 [Doc. No. 40-6 at 23]. She admitted she had signed into Unit 7 at 10:30 p.m. and back out at 10:45 p.m [*id.* at 25]. The next entry indicated

someone had signed into Unit 7 at 11:50 p.m. and out at 12:40 a.m. to deliver medications, but Plaintiff was unable to remember whether she had returned to Unit 7 [*id.*]. Plaintiff stated she might have returned to Unit 7 to give someone PRN medication [*id.*].

Plaintiff was also shown the officers' notes/log book from Unit 7 [*id.* at 26]. It showed Plaintiff had been in Unit 7 from 10:30 p.m. to 10:45 p.m [*id.* at 27]. The log book further stated that Plaintiff had emptied her bag of medications onto the desk and floor [*id.* at 28]. Plaintiff testified she did put her medications on the desk, but she was unable to recall if any of the medications had fallen on the floor [*id.* at 28-29]. The next entry indicated Plaintiff returned to Unit 7 around midnight. Plaintiff testified she was able to recall returning to Unit 7 to distribute PRN medications from about 11:50 p.m. to 12:40 a.m. after seeing the log book [*id.* at 31].

A copy of Woodlee's handwritten letter to Brewer of August 1, 2005, detailing the events of July 30-31, 2005 appears in the record. It states in pertinent part:

> On Saturday 7/31/05 at approx. 9:59 p.m I reported to work at STSRCF. At shakedown an officer told me that the nurse had been at the Annex for 2 hours without a reason. When I reached the clinic the Lieutenant called the clinic & said someone had checked on Nurse Sherry Boynton at the Annex and she had the clinic door locked and told the officers she was cleaning out expired medicines. When RN Sherry Boynton entered the clinic she told me she had spilled some calimine [sic] lotion at the Annex and was cleaning it up.
>
> At approx. [10:30] pm Unit 1 and Unit 7 called and said they had inmates yelling about 8 pm medicine. I asked RN Sherry Boynton about the 8 pm medicine & she said "I'm getting them" I asked if I could help her, she said "NO she had it under control." She went out of the clinic . . . she came back to the clinic in about 20 minutes and sat down and started talking. At approx. [11:30] p.m. Unit 1 called & said "what do you want me to tell these inmates about their 8pm meds? I told him I thought Sherry Boynton had given them. The officer . . . informed me that RN Boynton had come up there and laid a live frog on his desk & then told him she had forgotten to bring

8

inmate medicine to his unit. . . I asked RN Boynton & she said "Oh, I forgot" and went into the medicine room . . . I came into the medicine room and RN Boynton was getting inmate medicine out of the carts and putting the medicine in envelopes to take to Unit 1 . . . At approx. midnight Lt. Terry Brock called the clinic & asked what was wrong with Nurse Sherry Boynton. He informed me that she had gone to Unit 7 & had given some inmates the wrong medicine & then had spilled medicine all over the floor. The Lt. asked if I would go to unit & calm things down. When I got to unit 7 Nurse Boynton was on her way out & told me everything was alright. When we returned to the clinic I asked Nurse Boynton if she was finished with all her 2nd shift work. She told me she still had to go to unit 2 to give 8 pm medicines. I told her I would do that if she would go eat supper. I then prepared & delivered medicine to unit 2 inmates. When I got back to the clinic the phone was ringing and it was unit 1. Co. Phillips of unit 1 was upset & wanted to know why his inmates had not gotten their 8 pm meds. I asked Nurse Boynton & she casually stated "No I've not been up there yet." I told her I would do unit 1 medicine. I prepared and delivered meds to Unit 1.

[Doc. No. 40-7 at 2-4].

### 2.     Plaintiff's Termination and No Rehire Status

On August 1, 2005, Lewis sent a letter to Plaintiff terminating her employment at the prison

[Doc. No. 40-7 at 27]. The letter stated in pertinent part:

> As discussed in our telephone conversation on August 1, 2005 with RN3 Dottie Brewer and myself, your recent behavior/work practices are not acceptable for continued employment at Southeastern Regional.
>
> On July 29, 2005, you were given permission to stay over and complete the chain bus charts from July 28th; however, you did not leave the facility until the following morning at 7:30 am (7/30/05). On July 30, 2005, you returned to work for your regular 2nd shift assignment. During your shift, you failed to distribute medications to the annex and instead of delivering medications to the segregation units you placed a frog on the officer's desk and stated that you had forgotten to bring the medication. There have also been complaints that you have poured medications all over the desk and floor and have issued some inmates the wrong medications.

Medical personnel are vital to the operation of this facility. Distributing incorrect medications, and not performing your duties creates a serious problem. You are being dismissed from employment effective August 1, 2005.

You are a probationary employee and have no appeal rights to your job.

[*id.*]. On August 11, 2005, Lewis sent a letter to Plaintiff in response to a letter Plaintiff sent to one of the Acting Commissioners in the TDOC [Doc. No. 40-7 at 28-29]. The letter stated in pertinent part:

You also indicate that you were not allotted more intense training; but that other RN's hired after you had received the training. You received the same training as other RN's other than the training for new supervisors.

On April 25, 2005, we received a "return to practice" authorization from your [TNPAP] Case Manager . . . The "return to practice authorization contained the following restriction[] . . . No agency, registry, PRN, float pool or supervising nurse . . . Since your contract with [TNPAP] prohibited you from supervising anyone, you were not scheduled for new supervisor's training.

I have reviewed the certified letter that was sent to you on August 1, 2005 in regard to your dismissal. I concur that there is a misleading or false allegation in the statement that "you failed to distribute medication to the annex and instead of delivering medications to the segregation units you placed a frog on the officer's desk and stated that you had forgotten to bring the medication." As a matter of routine, one of the 2nd shift nurses remains in the compound clinic to handle the evening medication call for inmates coming to the clinic and the other 2nd shift nurse administers medication at the annex, units 1, 2 and 7. On the evening of July 30, 2005, you reported to the annex clinic at 7:40pm to distribute medications; but you did not return to the clinic on the compound until approximately 10:00pm. You had not gone to housing units 1, 2 or 7 to distribute the 8:00pm medications. At 10:30 pm, Officer Kris Phillips in unit 1 called to inquire about the medications. At that time Cindy Woodlee, LPN3, 3rd shift nurse, inquired to [sic] you in regard to the 8:00pm medications for the segregation units. You stated to her "I am getting them." When asked if she could help you told Ms. Woodlee "no, that you had it under control." According to Officer Phillips you did present to housing unit 1 and placed a live frog on his desk. When he

asked about the medications for the inmates in housing unit 1, you indicated that you had forgot to bring the medicine to the unit. You indicated to Officer Phillips that you would return in approximately 5 minutes. At approximately 11:30 pm, Officer Phillips again called the clinic wanting to know when the 8:00 pm medications would be delivered to the unit. Ms. Woodlee inquired again about the medicines for unit 1 and you indicated to her that you had forgot to take the medicines to unit 1. You went to the medication room and Ms. Woodlee inquired again if she could be of assistance in helping you to take the medications to unit 1. You told her at that time that [sic] "no" and you left the clinic. Ms. Woodlee thought that at that time you were going to housing unit 1, you did proceed to housing unit 7. Officer Jewell in unit 7 reported to Lt. Brock that you had poured medication all over the desk and floor and had issued some inmate the wrong medications. At that time this was reported to shift supervisor, Lt. Brock, who in turn requested that Ms. Woodlee go to unit 7 to assist with the situation. At that time you indicated to Ms. Woodlee that everything was okay. When Ms. Woodlee inquired if you had completed your 2nd shift work you indicated to her that you still needed to go to housing unit 2. At that time Ms Woodlee volunteered to take the medications to housing unit 2 and did so for you. Upon Ms. Woodlee's return to the clinic, Officer Phillips was again calling regarding the 8:00 pm medications for housing unit 1 inmates. Ms. Woodlee prepared and delivered the 8:00 pm medications to unit 1 inmates. Ms. Woodlee prepared and delivered the 8:00 pm medications to unit 1 around midnight.

Not administering medications at the prescribed times constitutes negligence. The fact that you were not able to deliver the 8:00 pm medications to housing units 1, 2 and 7 in a 4-hour period of time indicates inefficiency or incompetence in the performance of your duties. Taking a frog and placing it on the officer's desk rather than taking the medication for the inmates and administering medication shows poor judgment.

[*Id.*].

Further, on September 30, 2005, Lewis sent Plaintiff a letter regarding her dismissal which states:

It has been brought to my attention that your dismissal letter was unclear on your rehire rights for the State of Tennessee. Due to the type of environment in the Department of Correction and the problems that were encountered during your employment at

STSRCF, I am recommending a "no rehire" for TDOC be placed in your file. This restriction is only a recommendation and only affects the Department of Correction.

[Doc. No. 43-7 at 5].

Defendants responded to Plaintiff's interrogatory No. 3, which asked them to state whether Plaintiff was eligible for rehire with STSRCF, as follows:

A no-rehire (for the Department of Correction only) was placed in her record due to the type of security environment with the Department of Correction and the problems that were encountered during her employment at Southeastern Regional. Her initial dismissal letter inadvertently did not contain the information on rehire rights. This error was brought to Warden Lewis' attention on 9/22/05 by TDOC's Department of Personnel and a correction letter was sent to [Plaintiff] explaining her no rehire situation on 9/30/05.

[Doc. No. 43-7 at 2].

### 3. Plaintiff's Alcoholism

Prior to being hired at STSRCF, Plaintiff had been placed in the Tennessee Professional Assistance Program ("TNPAP") due to a substance abuse problem, alcoholism. It is not clear whether Defendants knew of Plaintiff's alcoholism, but they apparently had knowledge she was, or had been, enrolled in the TNPAP prior to her termination.

On April 25, 2005, the TNPAP issued a return to practice authorization for Plaintiff's work at STSRCF, noting her beginning date of employment was March 7, 2005 [Doc. No. 40-7 at 25]. The TNPAP return to practice authorization listed the following relevant restrictions on Plaintiff's work, "[n]o unsupervised practice, never the only professional on duty;" "[n]o overtime, no working two shifts within 11 hours of each other;" and "[n]o agency, registry, PRN, float pool or supervising nurse [*id.*]."

### III. Analysis

Defendants have moved for summary judgment on all of Plaintiff's remaining claims [Doc. No. 37]. They assert, as a matter of law, Plaintiff: (1) cannot establish a *prima facie* case for discrimination pursuant to the ADA, (2) cannot establish Defendants, in their individual capacities, violated her constitutional rights pursuant to 42 U.S.C. § 1983, and (3) cannot establish a state law claim for defamation against Defendants Brewer and Lewis [*id.* at 1].

Plaintiff concedes she does not have direct evidence of discrimination based upon her disability, *i.e.*, alcoholism [Doc. No. 43 at 3]. She asserts, however, she has indirect evidence of a *prima facie* case of discrimination [*id.*]. Plaintiff asserts there is a genuine issue of material fact as to her claim of defamation and her claim of a § 1983 violation [*id.* at 11]. Plaintiff also asserts she was retaliated against due to her filing a charge with the Equal Employment Opportunity Commission and her questioning the alleged suicide of an inmate [*id.* at 9-10].

## A. Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial

for resolving a material, factual dispute. *Id.* A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

### B.     ADA Claim

Plaintiff's claims under the ADA, except for her claim for injunctive relief, were dismissed under Fed. R. Civ. P 12(b)(1) as barred by the Eleventh Amendment. In her amended complaint, Plaintiff seeks "injunctive relief prohibiting STSRCF from discriminating against her due to her disability, namely alcoholism" [Doc. No. 23 at 5].

Defendants assert Plaintiff cannot prevail on her claim under the ADA because she cannot establish a *prima facie* case of discrimination as she is not disabled within the meaning of the ADA [Doc. No. 38 at 14]. Defendants further assert that, assuming *arguendo* Plaintiff can establish a *prima facie* case of discrimination, Plaintiff cannot establish she suffered an adverse employment action because of her disability as they have established a legitimate, non-discriminatory reason for Plaintiff's termination that Plaintiff cannot show was a pretext as a matter of law [*id.* at 14-16]. Defendants also assert Plaintiff cannot establish she suffered any adverse employment action due to her disability, because she cannot establish any of the Defendants regarded her as disabled or were aware of her specific disability [*id.* at 14-18].

A plaintiff with no direct proof of discrimination, as is the case here, can establish a *prima facie* case under the ADA if she has circumstantial proof of discrimination. *See Monette v. Electronic Data Systems Corp*, 90 F.3d 1173, 1186 (6th Cir. 1996). To establish a *prima facie* case

14

of discrimination, without direct proof of discrimination, a plaintiff must show: (1) he or she is disabled; (2) he or she is otherwise qualified to perform the job requirements, with or without reasonable accommodation; (3) he or she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the plaintiff was replaced. *Id.*

A disability under the ADA can be either a physical or mental impairment that substantially limits the major life activities of an employee or being regarded as having such an impairment by the employer. *Todd v. City of Cincinnati*, 436 F.3d 635, 636 (6th Cir. 2006) (citing 42 U.S.C. § 12102 (2)). Under the ADA regulations, "a major life activity means 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Moorer v. Baptist Memorial Health Care Sys.*, 398 F.3d 469, 479 (6th Cir. 2005) (quoting 29 C.F.R. § 1630.2(i)).

As the Sixth Circuit recently held:

> There are two ways to demonstrate that an employer "regarded" an employee as disabled:
>
> (1) an employer must mistakenly believe that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that the employer entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Gentry v. Summit Behavioral Healthcare*, 197 Fed. App'x 434, 438 (6th Cir. 2006) (unpublished).

"When the major life activity under consideration is that of working, the statutory phrase, 'substantially limits' requires at a minimum, that plaintiffs allege they are unable to work in a broad

class of jobs or 'a broad range of jobs in various classes.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). An inability to perform "a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

A plaintiff has the burden of establishing the existence of an impairment which substantially limits a major life activity as an element of her *prima facie* case. *Monette*, 90 F.3d at 1181. If a plaintiff establishes the elements of a *prima facie* case, "the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant satisfies its burden of production, the plaintiff must then show by a preponderance of the evidence that "the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). In order to establish pretext, "a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1087, 1083 (6th Cir. 1994)).

In order to create a genuine issue of material fact as to the legitimacy of her employer's explanation for the adverse employment decision, the plaintiff must show by a preponderance of the evidence, "either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." *Id.* Further, throughout the analysis, "the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place." *Id.* (quoting *Burdine*, 450 U.S. at 253).

During her deposition, Plaintiff testified she believes she is disabled because she is an alcoholic/recovering alcoholic [Doc. No. 40-4 at 79]. Plaintiff testified she has been diagnosed as an alcoholic [*id.*]. Plaintiff has also filed an affidavit stating she is a recovering alcoholic [Doc. No. 43-6 at 1]. Further, in her response to Defendants' motion for a summary judgment, Plaintiff asserts, without citing any precedent for her argument, she can show she is disabled because she was placed in the TNPAP program due to alcoholism [Doc. No. 43 at 5].

In this instance, Plaintiff cannot establish she was disabled because she cannot establish her alcoholism substantially limited one or more of her life activities, nor can she show she was regarded by Defendants as having an impairment. "There is no question that alcoholism is an impairment . . . under the ADA." *Moorer*, 398 F.3d at 479 n. 4 (quoting *Bailey v. Georgia-Pacific Corp.*, 306 F.3d at 1162, 1167 (1st Cir. 2002)). However, alcoholism is not a *per se* disability under the ADA; and the mere fact of a diagnosis of alcoholism does not preclude an individual inquiry as to the limitations imposed by alcoholism. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 315-16 (5th Cir. 1997). In order to show her alcoholism was a disability under the ADA, Plaintiff must show her alcoholism substantially limited one or more of her major life activities or that Defendants regarded her as having such an impairment.

Other than her statement that she is an alcoholic and a participant in the TNPAP program, Plaintiff has presented no evidence her alcoholism precluded or limited her from working in a broad range of jobs or in a broad range of jobs in various classes. The only restrictions identified by Plaintiff in connection with her alcoholism are the restrictions set forth in the TNPAP return to work authorization which limited her to "[n]o unsupervised practice, never the only professional on duty, [n]o overtime, no working two shifts within 11 hours of each other," and "[n]o agency, registry,

PRN, float pool or supervising nurse." [Doc. No. 40-7 at 25]. These restrictions did not prevent Plaintiff from working at STSRCF and she has not contended they would limit or prevent her from working in a broad range of jobs or in a broad range of jobs in various classes.

Likewise, Plaintiff has presented no evidence Defendants regarded her as disabled because of her alcoholism. Plaintiff asserts there is an issue of fact as to whether Defendants were aware of her alcoholism prior to her termination. During her deposition, Plaintiff stated she told Wilson during her interviews for the STSRCF position that she was in the TNPAP [Doc. No. 40-4 at 94]. Plaintiff also stated she told Brewer she was in the TNPAP program [*id.* at 99]. Plaintiff claims Brewer knew that being in the TNPAP program meant she was an alcoholic [*id.*]. Plaintiff admits she did not specifically tell Brewer she was an alcoholic; instead, she told Brewer she was in TNPAP [Doc. No. 40-5 at 3] ("I just used the term TNPAP."). Plaintiff acknowledged that, despite Wilson and Brewer's knowledge she was in TNPAP during the interview process, she was hired [*id.* at 7].

Lewis testified she learned of Plaintiff's participation in the TNPAP sometime during the latter part of April or the first of May 2005, after Plaintiff's TNPAP case manger, Steve Allen ("Allen"), contacted STSRCF regarding Plaintiff's work restrictions [Doc. No. 43-5 at 2]. Lewis stated Allen faxed a return to work authorization to STSRCF listing the restrictions, and she got a copy of the restrictions from either Plaintiff or Wilson [*id.* at 2-3]. Lewis also testified she did not know "still to this day" the reasons for Plaintiff's participation in the TNPAP [Doc. No. 40-8 at 8]. Lewis stated she had a general idea of the purpose of the TNPAP and it was her impression TNPAP addressed several different kinds of problems, including substance abuse, psychiatric, emotional and personal problems [*id.*]. Lewis stated she never inquired as to why Plaintiff was in the TNPAP

program after she found out Plaintiff was participating in the program because it was confidential [*id.*].

During his deposition, Wilson was asked about his understanding as to why Plaintiff was in the TNPAP program [Doc. No. 40-10 at 4].  He stated he did not know Plaintiff was participating in the TNPAP program because of alcohol "until the – the amended lawsuit back a few months ago as far as saying alcoholism" [*id.*].  Wilson stated his understanding of the reason for Plaintiff's participation in the TNPAP program was substance abuse, but he never talked with her case manager in the TNPAP program to find out the specific reason [*id.* at 4-5].

Brewer admitted she talked with TNPAP case manager Allen in April 2005, after she learned Plaintiff had restrictions on her work [Doc. No. 40-9 at 7; 43-4 at 4].  Brewer said she never asked why Plaintiff participated in the TNPAP and was not told why Plaintiff participated in the program [Doc. No. 40-9 at 7; Doc. No. 43-4 at 5].  Brewer stated she never had any indication why Plaintiff participated in the TNPAP [Doc. No. 40-9 at 7].  Brewer stated she did speak with Wilson about Plaintiff's participation in the TNPAP, but he never told her any reasons as to why Plaintiff participated in the program [*id.*].  Brewer stated it was her understanding participation in TNPAP was either drug, alcohol or mental health related, but she did not know which applied to Plaintiff [Doc. No. 43-4 at 5].

In an attempt to demonstrate a genuine question of material fact, Plaintiff has submitted an affidavit of a registered nurse who worked at STSRCF until March 2005, Theresa Roberson ("Roberson") [Doc. No. 43-2].  Roberson's affidavit states that prior to the time she left STSRCF in March 2005, Brewer knew Plaintiff had been involved in TNPAP [*id.*].  Although Plaintiff has presented evidence that prior to her termination, Brewer, Lewis, and Wilson knew she had been

involved with TNPAP and had certain work restrictions as a result, Plaintiff has submitted no evidence that Brewer, Wilson, or Lewis knew the reason for her participation in TNPAP was alcoholism or that she had been diagnosed as an alcoholic/recovering alcoholic.

Not only has Plaintiff presented no evidence Brewer, Wilson, or Lewis knew she was an alcoholic or had participated in TNPAP because of alcoholism, she has presented no evidence Brewer, Wilson, or Lewis regarded her as disabled due to alcoholism. In her deposition, Plaintiff asserted she was denied training opportunities and was treated differently from other employees because of her alcoholism [Doc. No. 40-4 at 75]. Plaintiff specifically stated she was denied training as a supervisor, but she admitted there was no other training that she was denied [Doc. No. 40-5 at 48].

Attached to Plaintiff's deposition is a memorandum dated May 13, 2005, from Brewer to Sherry Thompson, a training specialist at TDOC regarding Plaintiff, which states:

> On April 6, 2005 I sent you a memo advising you that Sherry Boynton, if retained, would be a supervisor and could attend a New Supervisory Training class in June. I was wrong, Steve Allen, Case Manager with TNPAP has advised me that Sherry Boynton, RN is participating in a program that restricts her form [sic] working in a supervisory position.

[Doc. No. 40-7 at 39].

With regard to the supervisor training for Plaintiff, Wilson testified:

> In [Plaintiff's] case, she was hired. She comes through one week of orientation here her first week. The next two weeks is at the Tennessee Corrections Academy, and then she would be scheduled – at that time before we knew about the peer assistance, she was scheduled – she would have been scheduled to go to a new supervisor training, but at that time once we found out she could not do that, we had to put that off.

[Doc. No. 40-10 at 6].

Brewer testified Plaintiff was supposed to be a supervisor, but before she could be sent to supervisor training, they received the restrictions from TNPAP which said she could not be a supervisor [Doc. No. 43-4 at 11]. Brewer said when a registered nurse is going to be a supervisor, there is a policy or regulation requiring they complete certain training [*id.* at 12]. Brewer said she intended to send Plaintiff to supervisor training in June, but she received the TNPAP restrictions. In addition, two other individuals were available to send to supervisor training [*id.* at 12-13]. Brewer said she could not send all three to the supervisor training, which is offered only every other month, and she "had already found out that [Plaintiff] couldn't be a supervisor" so she scheduled one of the other individuals for training in June and the second individual for training in August [*id.* at 13].

Thus, Plaintiff has adduced no evidence Defendants denied her a training opportunity based upon a disability under the ADA. As previously discussed, Plaintiff has produced no evidence Defendants regarded her as disabled within the meaning of the ADA. Therefore, I conclude there is no genuine issue of material fact, and, as a matter of law, Plaintiff cannot establish a *prima facie* case of discrimination under the ADA against STSRCF for injunctive relief.

Even assuming *arguendo* Plaintiff could establish a *prima facie* case of discrimination, Defendants have established a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff has produced no evidence showing Defendants' stated reason for her termination was a pretext for discrimination. Although it is impossible based upon Plaintiff's testimony to determine exactly when the "med pass" medications were delivered at STSRCF on the night of July 30, 2005, it is undisputed that the "med pass" medications had not been delivered to Units 1, 2, and 7 by 8:00 p.m. or shortly thereafter. Defendants have advanced an explanation for the lawful termination of

Plaintiff's employment; namely, her failure to timely deliver the "med pass" medications.

Brewer testified at length about Plaintiff's termination [Doc. No. 43-4 at 5-9]. Brewer stated she had a discussion about Plaintiff's termination with Wilson, who talked to Lewis [*id.* at 6]. Brewer testified Lewis made the decision to terminate Plaintiff, although she and Wilson had input into the decision [*id.* at 6]. Brewer stated she recommended termination because Plaintiff "was not performing at the level she should have." [*Id.* at 13]. Brewer stated she does not know why Plaintiff was not performing, but she "[j]ust didn't seem to be doing it." [*Id.*].

Brewer also stated Lewis and Wilson had wanted to terminate Plaintiff on at least one other prior occasion and she asked that they give Plaintiff a chance [*id.*]. Brewer stated the other time Lewis and Wilson wanted to terminate Plaintiff was during the first week of her employment in March 2005 [*id.*].

When asked about whether there were complaints about Plaintiff's performance, Brewer stated the only complaint concerned the incident on July 30, 2005 [*id.* at 9]. Brewer stated there was no disciplinary process for probationary employees and Plaintiff was only disciplined when she was terminated [*id.*].

With regard to the decision to terminate Plaintiff, Wilson testified he made a recommendation to terminate Plaintiff [Doc. No. 43-3 at 3]. Wilson stated he made the recommendation to terminate "based basically on the happenings of the medication not being taken to the units 8:00-wise, the 8:00 medications . . . we felt this to be serious when inmates don't get medication, and it's very, very important." [*Id.* at 4]. Wilson acknowledged the inmates did eventually receive their medication "well after midnight by another nurse" [*id.*]. Wilson also stated to his recollection the 8:00 "med pass" had never happened that late before [*id.*].

Lewis also testified about her decision to terminate Plaintiff [Doc. No. 43-5 at 4]. She stated she checked with Brewer to see what had happened and also checked to see that Woodlee had distributed the "med pass" medications [*id.* at 5]. Lewis stated she also reviewed the log books for Units 1, 2, and 7 and the employee sign in and sign out log at the shakedown desk [*id.*]. Lewis stated she telephoned Plaintiff to let her know she was not going to be retained as a nurse and would receive a termination letter [*id.* at 6]. Lewis stated she did not give Plaintiff a chance to tell her version of the events because "[i]t was quite clear that she did not give her medications out as she had been doing previously on second shift" [*id.* at 6]. Explaining her decision to terminate Plaintiff, Lewis testified:

> The reason I terminated her was because I got information not only had she not given her – neglected to give her medications on her shift that she was assigned to do so between 2:00 and 10:00 p.m. and still – even though she stayed on for two more hours, she still did not get her job performed. That was a performance issue. That's a neglect issue. The night before she had had to stay over to do work that should have been done the previous night which she wasn't able to get done, and after being employed for five months on the job of second shift knowing what should have been done, all of a sudden, she begins to neglect in doing her job or not getting her job done, so that's poor performance and neglect.

[Doc. No. 40-8 at 12].

Lewis also testified about problems with Plaintiff's performance during the first week of her employment in March 2005 [*id.* at 4]. Lewis stated she first heard of concerns with Plaintiff's performance during orientation on March 14, 2005 when she was told Plaintiff:

> didn't work one day of the orientation, which was March 8. On March 10, she left 45 minutes to an hour early without authorization. March 11, she left without authorization somewhere around 2:00 p.m. She was instructed to make up her day that she lost for March 8 on Saturday, March 12, she was to work from 2:00 p.m. to 10 p.m. She didn't work the full eight-hour or 7.5 hours. At that time, I think she

23

left around 8:00 p.m., as I recall.

[*id.* at 4]. Lewis stated this information was brought to her attention by Linda Cox ("Cox"), a personnel analyst [*id.* at 5]. Lewis stated that Cox recommended she terminate Plaintiff at that time because Cox did not think Plaintiff would be a good employee [*id.* at 7]. Lewis stated she discussed the matter with Wilson, who in turn discussed the matter with Brewer, and Plaintiff was not terminated at that time because "they wanted to go ahead and give her another chance." [*id.*].

Plaintiff has presented no evidence that suggests the legitimate, non-discriminatory reason advanced by Defendants for her termination was a pretext for discrimination based upon her alcoholism. In her affidavit, Plaintiff asserts "Brewer told me I was 'too much of a liability' in regards to my termination from [STSRCF]" [Doc. No. 43-6]. This statement from Brewer, who was not the individual who decided to terminate Plaintiff, is simply too vague to constitute sufficient evidence that the legitimate, non-discriminatory reason advanced by Defendants for Plaintiff's termination was pretextual. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993).

Plaintiff also relies upon the affidavit of former employee Roberson who stated "Brewer advised me that they were going to try to fire Ms. Boynton." [Doc. No. 43-2]. Given that Roberson left STSRCF in March 2005, Brewer's statement to Roberson may have concerned the events during Plaintiff's orientation in March 2005 when Brewer persuaded Lewis not to terminate Plaintiff, but this statement clearly cannot relate to the events of July 2005.

Attached to Plaintiff's deposition is a handwritten letter dated February 3, 2006, which she sent to Commissioner Little of the TDOC concerning her termination [Doc. No. 40-7 at 30-37]. Plaintiff's letter to Commissioner Little does not mention either her alcoholism or her participation in TNPAP. Plaintiff's letter also does not state she was wrongfully terminated due to her alleged

disability. Rather, Plaintiff's letter complains she "was not given an opportunity to defend myself." [*Id.* at 34].

During her deposition, Plaintiff admitted that at the time of her termination, she was a probationary employee with the State of Tennessee/TDOC [Doc. No. 40-5 at 100]. She also admitted that, because she was a probationary employee, the state was not required to give her an opportunity to defend her actions [*id.*]. Moreover, Plaintiff stated that as a probationary employee, she could have been terminated for any (lawful) reason or no reason [*id.* at 100-01].

Plaintiff may, as she claims, suffer from alcoholism or be recovering from alcoholism. However, the undisputed material evidence shows Plaintiff was terminated for reasons wholly unconnected to her alcoholism. Although the ADA "protects an individual's status as an alcoholic merely being an alcoholic does not insulate one from the consequence's of one's actions." *Marrari v. WCI Steel, Inc.*, 130 F.3d 1180, 1182 (6th Cir. 1997) (internal quotation omitted). Thus, I conclude, even assuming Plaintiff could make out a *prima facie* case of discrimination under the ADA, she has failed to adduce any probative evidence that the legitimate, non-discriminatory reason advanced by Defendants for her termination was a pretext for wrongful discrimination under the ADA.

As there is no genuine issue of material fact with regard to Plaintiff's remaining claim for injunctive relief under the ADA, that aspect of Defendants' motion for a summary judgment on Plaintiff's claims for injunctive relief under the ADA [Doc. No. 37] will be **GRANTED**.

C.    **Plaintiff's § 1983 Claims**

Defendants also seek summary judgment on Plaintiff's claims against them in their individual capacity under 42 U.S.C. § 1983. Plaintiff asserts § 1983 claims against the individual

Defendants for: (1) allegedly terminating Plaintiff for exercising her First Amendment right of free speech and (2) for placing Plaintiff in a "no rehire" status allegedly resulting in an unconstitutional deprivation of property [Doc. No. 38 at 21-24].

### 1.    First Amendment Claim

Plaintiff contends in July 2005 she questioned Brewer about the suicide of an inmate [Doc. No. 23 at 4]. Plaintiff claims she was suspicious of the apparent suicide because the allegedly illiterate inmate left a suicide note [*id.*]. Plaintiff asserts the Defendants' actions in terminating her after she questioned the suicide of an inmate was a violation of her first amendment right to free speech [*id.*]. Defendants assert Plaintiff's questioning of an inmate's suicide was not directed toward a matter of public concern, but even if it was, she cannot establish her "speech," *i.e.*, questioning the circumstances of an inmate's alleged suicide, was a matter of public concern [Doc. No. 38 at 22-24]

In the Sixth Circuit, an allegation of a First Amendment violation is tested under the two-stage inquiry set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). *Bailey v. Floyd County Bd. of Educ. By and Through Towler*, 106 F.3d 135, 144 (6th Cir. 1997). Under the *Mount Healthy* test, an employee must first establish her speech was constitutionally protected. *Bailey*, 106 F.3d at 144. In order for speech to be protected: (1) it must address a matter of public concern and (2) the employee's interest in making the statement must outweigh the "interest of the State, as an employer in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

If able to make such a demonstration, the employee/plaintiff "then has the burden of showing that the speech was a 'substantial' factor - a 'motivating' factor - in the employer's decision to

terminate his or her employment." *Id.* (quoting *Mount Healthy*, 429 U.S. at 287). In showing the speech was a substantial or motivating factor in the decision to terminate her employment, a plaintiff "may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Bailey*, 106 F.3d at 145 (quoting *Collyer v. Darling*, 98 F.3d 211, 228-29 (6th Cir. 1996)). Rather, "the employee must point to '"specific nonconclusory allegations" reasonably linking her speech to" the employer's adverse employment discipline. *Id.* (quoting *Wright v. Illinois Dep't. of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994)).

In this case, assuming *arguendo* Plaintiff can establish that her questioning of the inmate's suicide was constitutionally protected, she can point to no specific non-conclusory allegations linking her termination to such speech. With regard to the alleged suicide, Plaintiff testified:

> I told . . . Brewer that when the funeral home picked up Inmate Reynolds, which he had laid in the clinic like six hours, had his little suicide note pinned to his shirt, a lengthy note, like a legal pad all folded, and I go to document in the chart what time they picked up the body. I'm looking through the chart and see that he was illiterate and could not have written that long note.

[Doc. No. 40-6 at 35]. Plaintiff stated she believed the inmate was illiterate because his chart said so [*id.*]. She also admitted she never read the note [*id.*]. Plaintiff testified that she did not believe asking about the inmate's suicide was a public concern, but she felt it was an in-house matter that STSRCF Internal Affairs should have investigated [*id.* at 38]. Plaintiff admitted, however, she did not inform Internal Affairs about her concerns surrounding the inmate's suicide [*id.* at 39] and she stated she was not alleging the inmate was killed or that there was anything illegal surrounding the inmate's death [*id.* at 40].

Brewer testified she remembered the inmate's suicide [Doc. No. 40-9 at 9]. She stated the inmate was found hanging in his cell and had left a suicide note [*id.*]. Brewer stated the mental

health program specialist at STSRCF who told her the inmate left a suicide note also told her it was "bizarre" that the inmate had left a suicide note because he supposedly could not read or write [*id.* at 9-10]. Brewer stated she was concerned about how the inmate had left a suicide note if he could not read or write and she checked with the education department at STSRCF [*id.* at 10]. Brewer said the education department told her the inmate "could, indeed, read and write, but that he liked to make everybody believe he couldn't. And they produced copies of things he had written." [*Id.*]. Among the things produced to Brewer by the education department were the inmate's school work and letters [*id.*]. Brewer stated that other than her unofficial inquiry to the education department, there was no inquiry as to the inmate's suicide [*id.* at 10]. She had no recollection of ever having a conversation with the Plaintiff about the inmate's suicide [*id.*].

As previously noted, a copy of the handwritten letter Plaintiff wrote to TDOC Commissioner Little on February 3, 2006, is attached to her deposition [Doc. No. 40-7 at 30-37]. In her letter Plaintiff did not mention that she had questioned the inmate's suicide, much less assert that her alleged expression of concerns to Brewer about the circumstances surrounding the inmate's death played a role in the decision to terminate her. Also, Plaintiff has not claimed she ever expressed her concerns about the inmate's suicide to either Lewis or Wilson.

Thus, other than the mere temporal proximity between Plaintiff's alleged expression of her concerns over the inmate's suicide to Brewer and her termination, Plaintiff can point to nothing in the record which links her speech to the decision to terminate her. As discussed above, Plaintiff has failed to present probative evidence indicating the necessity of a trial for resolving a material, factual dispute concerning the lawfulness of her termination. Plaintiff has adduced no material evidence to contradict the Defendants' explanation for her termination, *i.e.*, her failure to timely deliver the

"med pass" medications during the second shift of July 30, 2005. The temporal proximity between Plaintiff's alleged question to Brewer about the suicide and her termination is not enough to establish retaliation. *See Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005) (holding the mere fact plaintiff was discharged after filing a charge of discrimination was not, without more, sufficient for a finding of retaliation).

As there is no genuine issue of material fact, Defendants are entitled to summary judgment on Plaintiff's claim she was terminated for exercising her First Amendment right of free speech in violation of 42 U.S.C. § 1983. Therefore, that aspect of Defendants' motion which seeks summary judgment on Plaintiff's claim she was terminated for exercising her First Amendment right of free speech in violation of 42 U.S.C. § 1983 [Doc. No. 37] will be **GRANTED**.

### 2. No Rehire Claim

Plaintiff also alleges Defendants' actions in placing a "no rehire" notice in her personnel file resulted in an unconstitutional deprivation of property in violation of 42 U.S.C. § 1983 [Doc. No. 23 at 4]. Defendants assert Plaintiff cannot establish she suffered an unconstitutional deprivation of property pursuant to § 1983 because (1) her "no rehire" status applies only to the TDOC; (2) as a probationary employee Plaintiff had no right to her employment at TDOC; and (3) Plaintiff has no proof establishing she had any right to be rehired by either TDOC or the State of Tennessee [Doc. No. 38 at 24].

In her response to Defendants' motion for a summary judgment, Plaintiff did not respond to Defendants' arguments she did not suffer an unconstitutional deprivation of property. Instead, she attempts to assert a claim that she was placed in the "no rehire" status in retaliation for her filing a charge with the Equal Employment Opportunity Commission ("EEOC") [Doc. No. 43 at 9].

Plaintiff did not assert such a claim in her amended complaint [Doc. No. 23] and she has not sought

leave of the Court to amend her complaint to assert such a claim.[3]

To have a property right in an employment relationship, one must "have a legitimate claim

of entitlement to it." *Bzdzuich v. U. S. Drug Enforcement Admin*, 76 F.3d 738, 742-43 (6th Cir.

1996) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Plaintiff, who has admitted

she was a probationary employee, cannot establish she has any right to continuing or future

employment with the TDOC. With regard to persons hired for employment with the State of

Tennessee, Tenn. Code Ann. § 8-30-312 provides, in pertinent part:

> Every person appointed to a position . . . shall be subject to a
> probationary period of employment. The probationary period shall
> commence immediately upon appointment and shall continue for
> such time, not less than six (6) months. . . At any time during the
> employee's probationary period, after the first month thereof, the
> appointing authority may remove the employee if, in the opinion of
> the appointing authority, the employee's work during the
> probationary period indicates that such employee is unable or
> unwilling to perform duties satisfactorily, or that the employee's
> habit and dependability do not merit continuance in the service.

Further, the Rules and Regulations of the Tennessee Department of Personnel, Civil Service

Regulation, TN ADC § 1120-2-.11.(4)(a) states:

> An employee on initial probation may not be dismissed for cause
> relating to performance of duties before completion on one month's
> service. Employees dismissed during their initial probationary period
> have neither right of appeal nor right of hearing. The reason for

---

[3] While Plaintiff's claim that the "no rehire" decision was made in retaliation for her filing an EEOC charge is not properly before the Court, the Court notes Defendants have explained the circumstances of the "no rehire" decision in their response to Plaintiff's interrogatory number 3 [Doc. No. 43-7 at 2], and they also have attempted to respond to the claim in their reply to Plaintiff's response to their summary judgment motion. Attached to Defendants' reply is a worksheet completed on August 22, 2005, which reflects the effective date of the "no rehire" status is August 9, 2005 [Doc. No. 45-2 at 1]. Plaintiff filed her complaint with the EEOC on August 20, 2005 [Doc. No. 40-7 at 18], but, as noted above, did not assert a retaliation claim in her amended complaint.

dismissal must be submitted to the Commissioner in writing.

In addition, TN ADC § 1120-2-.14(7) states "[w]henever an employee leaves State employment the appointing authority may make a recommendation concerning reemployment." In Tennessee, during the probationary period, a non-tenured employee does not have a property interest in continuing employment which entitles her to due process protection pursuant to either the United States Constitution or the Constitution of Tennessee. *Christians v. State Dep't of Corrections*, 790 S.W.2d 535, 538 (Tenn. Ct. App. 1990). Under Tennessee law, "an employer may terminate an employment at-will relationship at any time for good cause, bad cause or no cause." *Sullivan v. Baptist Memorial Hosp.* 995 S.W.2d 569, 574 (Tenn. 1999).

Lewis testified the "no rehire" was placed in the Plaintiff's civil service file and will appear on the civil service register for the State of Tennessee [Doc. No. 43-5 at 9]. Lewis stated the "no rehire" status applies to the TDOC; and, that if other potential employers with the State looked at the "no rehire" they would make their own decision as to whether to hire Plaintiff [*id.*].

Wilson testified the warden of a facility can place a "no rehire" in the file of any employee that is terminated [Doc. No. 43-3 at 11]. He stated the "no rehire" would appear as an asterisk on the civil service register; and, it was his belief only the Commissioner of TDOC could remove a "no rehire." [*Id.*]. Although the "no rehire" only applied to the TDOC, Wilson acknowledged he believed a "no rehire" would negatively affect an individual's ability to get an job with another state agency [*id.* at 12].

As noted, Plaintiff acknowledged she was a probationary employee who could be terminated at any time for any reason or no reason [Doc. No. 40-5 at 100-01]. Plaintiff also admitted the "no rehire" status only applied to the TDOC, not state employment in general [Doc. No. 40-6 at 5] [*id.*].

Plaintiff testified she is now working as an independent contractor [*id.*]. Further, Plaintiff admitted she has no right to be rehired by the State of Tennessee [*id.* at 42]. Plaintiff stated she was concerned because she lived close to the Taft Youth Center, another TDOC facility [*id.* at 6]. However, Plaintiff has not identified any jobs with the TDOC or the State of Tennessee that she applied for after being terminated from STSRCF. Plaintiff has not identified any employment with the TDOC or State of Tennessee which was denied as the result of the "no rehire" notice in her personnel file.

Importantly, Plaintiff has not established she had any property right to new employment or continuing employment with the STSRCF, the TDOC, or the State of Tennessee. Accordingly, I conclude there is no genuine issue of material fact with respect to Plaintiff's "no rehire" claim. Defendants are entitled to summary judgment on Plaintiff's claim she suffered an unconstitutional deprivation of property in violation of 42 U.S.C. § 1983 as a result of Defendants' decision she was not eligible for rehire. Therefore, that aspect of Defendants' motion which seeks summary judgment on Plaintiff's claim she was unconstitutionally deprived of property in violation of 42 U.S.C. § 1983 [Doc. No. 37] will be **GRANTED**.

D.    **Plaintiff's Defamation Claim**

Defendants also seek a summary judgment on Plaintiff's state law claims of defamation, alleging Plaintiff cannot establish a *prima facie* case of defamation against either Brewer or Lewis, the only two Defendants the Plaintiff has asserted a claim of defamation against [Doc. No. 38 at 25-28]. In her response to Defendants' motion, Plaintiff asserts that she can establish a *prima facie* case of defamation against Brewer because:

> Although Plaintiff was not aware of the exact words spoken during
> the lunch conversations between employees, Theresa Roberson was

aware of such. Ms. Roberson recalls witnessing several persons making fun of Ms. Boynton and stating she must use drugs. Ms. Roberson further states that Ms. Brewer was present during these conversations.

[Doc. No. 43 at 8].

Plaintiff also asserts she can establish a *prima facie* case of defamation against Lewis because Lewis' letter of August 1, 2005 falsely claims she did not distribute medication to the Annex [Doc. No. 43 at 8-9]. Plaintiff also asserts, without identifying the statements made, that Lewis ridiculed her while she was employed at STSRCF and spread "misinformation" about her job performance [*id.*].

To establish a *prima facie* case of defamation in Tennessee, a plaintiff must show: "(1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Under Tennessee law, "'publication' is a term of art meaning the communication of defamatory matter to a third person." *Id.* (citing *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 821 (Tenn. 1994)).

### 1. Defamation Claim against Brewer

In her deposition, Plaintiff stated Brewer made harsh and slanderous statements about her one day during lunch [Doc. No. 40-5 at 60]. Plaintiff admitted she was not there, but she stated Roberson told her about the one occasion this happened [*id.* at 61]. Plaintiff further admitted she did not know what Brewer was alleged to have said [*id.*].

Roberson's affidavit states:

3.      That I witnessed persons at STSRCF make fun of

Sherry Boynton and state that she must be using drugs. Dorothy Brewer was present during several of these conversations.

. . .

5.      That persons at STSRCF, including Dorothy Brewer, spoke very poorly about Ms. Boynton.

[Doc. No. 43-2 at 1].

Plaintiff, however, has produced no evidence identifying even a single defamatory statement Brewer made knowing it was false. With regard to Roberson's affidavit, Plaintiff admits she does not know what Brewer said and Roberson's affidavit states only that Brewer was present when persons at STSRCF made statements about Plaintiff. Therefore, Plaintiff cannot show Brewer made, *i.e.*, published, any statements about Plaintiff. Thus, there is no genuine issue of material fact and, as a matter of law, Plaintiff cannot establish a *prima facie* case of defamation against Brewer.

## 2.      Defamation Claim against Lewis

As noted above, Plaintiff claims Lewis defamed her in Lewis' letter of August 1, 2005, when Lewis stated she placed a frog on the officer's desk rather than distributing medications [Doc. No. 40-7 at 27]. Plaintiff specifically testified the false statements Lewis made are contained in the August 1, 2005 letter she received from Lewis [Doc. No. 40-5 at 73]. However, when asked what proof she had that Lewis knew the allegations were false when she wrote the letter, Plaintiff responded "not allowing me to defend myself or giving me any opportunity" [*id.* at 75]. Plaintiff admitted that other than the fact she was not allowed to defend herself she had no proof Lewis knew the allegations were false when she made them [*id.*].

Lewis acknowledged the statement that Plaintiff failed to deliver medication to the Annex was misleading because Lewis eventually concluded Plaintiff did deliver medication to the Annex

[Doc. No. 43-5 at 7]. Lewis stated she did not believe any other statements in the August 1, 2005 letter were misleading based on the letter from Woodlee and the other information she received prior to sending the letter [*id.*].[4]

Although Lewis has admitted that a single statement in her letter of August 1, 2005, was misleading, Plaintiff has not shown that Lewis knew the statement was false or that she made the statement with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement at the time she wrote the letter. Moreover, under Tennessee law, Plaintiff cannot show that Lewis published the statement to a third party. Lewis sent the letter to Plaintiff setting forth her reasons for her decision to terminate Plaintiff. Lewis did not send the letter to any third-party and the only way any third-party could know about Lewis' allegedly defamatory statement is if Plaintiff showed this letter to another individual or told another individual about Lewis' statement in the August 1, 2005 letter.

In *Sullivan v. Baptist Memorial Hosp.*, 995 S.W.2d 569, 570 (Tenn. 1999), the Tennessee Supreme Court considered the issue of publication in an employment context; namely, in the situation where an employee is compelled to disclose to a prospective employer the allegedly defamatory reasons given for her termination by a former employer. In *Sullivan*, the plaintiff was terminated by Baptist Memorial Hospital based upon false and defamatory accusations and, subsequent to her termination, Sullivan was compelled to reveal the defamatory reasons given for her termination by the hospital to a prospective employer. *Id.* Sullivan filed suit alleging defamation and Baptist Memorial sought summary judgment on the ground it did not publish the defamatory statements. *Id.* The trial court granted Baptist Memorial's motion finding that self-

---

[4] In her August 11, 2005 letter, Lewis acknowledged this statement was incorrect [Doc. No. 40-7 at 28-29].

published statements do not satisfy the publication element of a cause of action for defamation under Tennessee law. *Id.* The Tennessee Court of Appeals reversed the trial court but the Supreme Court of Tennessee reversed the court of appeal's decision and affirmed the trial court's grant of summary judgment. The Tennessee Supreme Court held Tennessee would not recognize self-publication as constituting publication for defamation purposes even when the employee is compelled to self-publish her former employer's allegedly defamatory reasons for her termination by prospective employers. *Id.* at 573-74. Thus, Plaintiff cannot establish the publication element of a *prima facie* claim for defamation under state law with regard to the statements made in Lewis' August 1, 2005 letter as a matter of law.

Accordingly, that aspect of Defendants' motion which seeks a summary judgment on Plaintiff's state law claims of defamation against Brewer and Lewis [Doc. No. 37] will be **GRANTED**.

## IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment [Doc. No. 37] is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

A separate judgment will enter.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE